

Timothy C. Parlatore, Esq.
Founder & Managing Partner

January 16, 2020

Office of Inspector General
United States Department of Defense,
4800 Mark Center Drive
Alexandria, VA 22350-1500

*Re: Complaint against David Ursini*

I represent LtCol Michael Nesbitt, CDR Martin Weyenberg and CDR Bryan Roberts. I am writing this letter on behalf of my clients, to formally complain of the conduct of David Ursini, an investigator in your office in his handling of an investigation into my clients.

Mr. Ursini, a former Naval Flight Officer[1], was assigned to investigate the claims of whistleblower retaliation and restriction against LT Steven Shaw, USN, an Instructor Under Training (IUT) at Strike Fighter Squadron 106 (VFA-106), the F/A-18 Fleet Replacement Squadron (FRS) at Naval Air Station Oceana Virginia.  During his time at VFA-106, LT Shaw never completed a single qualification; instead he devoted an enormous amount of time and effort to undermining the squadron leadership, his fellow instructors, and the approved Navy training methods and flight procedures.  However, the most significant issues identified with LT Shaw were:

1. Secretly teaching students to disregard the approved Navy method of landing on an aircraft carrier, in favor of his unapproved and potentially deadly technique;
2. Intentionally violating regulations by repeatedly bringing an unauthorized camera into a secure space with Top Secret material present; and
3. Willfully disobeying orders to cease his unlawful activities.

It is undisputed that squadron leadership took steps to hold LT Shaw accountable for this misconduct, which LT Shaw then complained of as retaliatory.  However, as outlined herein, Mr. Ursini's investigation and analysis of that alleged reprisal fails on the essential element of causation – whether the same personnel action(s) have been taken, withheld, or threatened absent the protected communication.  One need only consider the depth of LT Shaw's misconduct and its potentially deadly implications to conclude that the actions taken by my clients are exactly what the Navy expects of **any** commander when faced with a similar situation.  Mr. Ursini failed to reach this obvious conclusion because he conducted an entirely improper investigation, violated regulations and constitutional protections, minimized or ignored anything that conflicted with his predetermined outcome.

---

[1] It is unknown whether Mr. Ursini is still an active duty member of the U.S. Navy as he has alternatively represented himself to be a Commander and a civilian.

One World Trade Center, Ste 8500
New York, NY 10007

timothy.parlatore@parlatorelawgroup.com
www.parlatorelawgroup.com

212.679.6312 direct
212.202.4787 fax

Even a cursory review of the evidence shows that LT Shaw must have devoted hundreds of hours to creating an entire parallel and unauthorized program of instruction to secretly teach FRS students. He also used every opportunity to criticize the approved methods and attempt to discredit the qualified instructors to the students, while encouraging them to follow his unapproved methods instead.  Many of these methods, as later evaluated by the experts at Air Test and Evaluation Squadron 23 (VX-23), were extremely dangerous and risked the death of both the pilots, as well as the flight deck crews.

Naval Air Training and Operating Procedures Standardization (NATOPS) are the Navy's mandatory flight operating instructions and procedures, most of which have been written in blood in response to fatal mishaps.  Although Mr. Ursini' prior aviation experience was not in a carrier-based aircraft, he should have still been sensitive to the extreme dangers of LT Shaw's contempt for these procedures and his subversive efforts to convince students to ignore them.  Instead, Mr. Ursini willfully ignored these obvious performance and safety issues.

LT Shaw also demonstrated a deep animus towards the command and a desire to destroy VFA-106.  During his time at VFA-106, prior to the discovery of the dangerous activities outlined above, he had made at least 11 separate protected communications.  Many, if not all of these appear to have been situations where LT Shaw sought opportunities to go outside the chain-of-command to make the squadron look bad[2], such as approaching former students who had failed out of the program before LT Shaw even reported onboard to counsel them on how to file IG complaints. Despite the large number of IG complaints, LT Shaw never once attempted to approach his chain-of-command and give them the opportunity to correct any of the problems that he perceived. Additionally, most of these complaints were ultimately unsubstantiated.

If there were any doubt as to LT Shaw's desire to destroy VFA-106, he admitted to creating an unauthorized uniform patch, which he dubbed the "underground runway patch," which he gave to any of the students "who get it" and followed his teachings, as opposed to the approved Navy curriculum.  This "underground runway patch" contains a profoundly disturbing modification of the VFA-106 patch, with the spear turned around to impale the gladiator through the face, with blood pouring down.  This image, glorifying the murder of the squadron mascot, is clearly a physical manifestation of LT Shaw's hatred and desire to destroy the squadron:



---

[2] After the success of the "bottle bet" complaint, LT Shaw even told squadron leadership that he was going to start filing more IG complaints, but refused to speak with squadron leadership about what issues he perceived, so that they could attempt to rectify those issues.

Not only did Mr. Ursini ignore all of this, but he also made no secret about his bias, as he describes himself on his LinkedIn profile as an "influential" investigator.[3] An effective investigator should not consider themselves to be "influential," but rather fair and impartial. Evidence of Mr. Ursini's bias permeates this entire investigation, as he has violated a number of investigative principles to ensure that his reports would reflect the pre-determined conclusion.

**Mr. Ursini Failed to Properly Evaluate the Fourth Required Element of Causation**

As clearly laid out in the DoD Inspector General's Guide to Investigating Military Whistleblower Reprisal and Restriction Complaints (the Guide), there are four elements to consider when evaluating an allegation of whistleblower retaliation:

- **Element 1, Protected Communication (PC):** Did Complainant make or prepare to make a protected communication, or was Complainant perceived as having made or prepared to make a protected communication?
- **Element 2, Personnel Action (PA):** Was an unfavorable personnel action taken or threatened against Complainant, or was a favorable personnel action withheld or threatened to be withheld from Complainant?
- **Element 3, Knowledge:** Did the responsible management official(s) have knowledge that Complainant made or prepared to make protected communication(s) or perceive Complainant as making or preparing to make protected communication(s)?
- **Element 4, Causation:** Would the same personnel action(s) have been taken, withheld, or threatened absent the protected communication(s)?

The first three elements were never in dispute, only the fourth. Mr. Ursini's analysis of this critical fourth element failed because he did not consider the severity of LT Shaw's misconduct or the fact that my clients had no viable options to discharge their duties other than to take the actions that they did in order to mitigate the extraordinary danger that LT Shaw posed to the students, as well as other aviators and flight deck crews. Rather than looking for inferences to try to fit his predetermined conclusion, Mr. Ursini would have been better off considering the ultimate question – What personnel actions would normally be taken for an individual who committed the acts that LT Shaw committed, if there were no protected communications at issue? What do we expect our squadron commanders to do when faced with a subordinate who commits the following:

1. Creates and distributes an entirely unauthorized and unapproved course of instruction to students, including materials teaching potentially deadly and prohibited techniques in areas that the IUT is not qualified to teach.
2. Continues to secretly distribute this material to students after a direct order to stop.
3. Maintains an unduly familiar relationship with the students.
4. Actively works to undermine the approved course of instruction and the qualified instructors by communicating privately with students, telling them upon checking in, "everything you've ever been told is a lie"

---

[3] https://www.linkedin.com/in/david-ursini-32468369/

3

5. Tells students to ignore the Tactical Pocket Checklist (PCL). Despite the fact that the PCL is the only approved procedure, he secretly tells the students that "the tac pcl is useless" before their first ever flight with live bombs.
6. Tells students that the Navy training methods are inadequate.
7. Sneaks an unauthorized camera into secured spaces to take unauthorized videos.
8. Asks students to sneak him back into those same secured spaces after his clearance is suspended.
9. Gives multiple media interviews, in violation of PAO instructions, where he criticizes the Navy's training methods, holds himself out to be a master instructor (despite his failure to achieve any instructor qualifications) and admits that "unofficially" he is trying to change "the entire training culture for naval aviators."
10. Despite his claims of inventing a better method of landing on a carrier and trying to change the entire training culture, he failed to submit any of these as official change requests.
11. Creates and distributes patches to students who follow his teachings. This patch looks very similar to the squadron patch, with the exception that it depicts the squadron mascot being murdered.

The answer to this question is clear – we would expect that **every** commanding officer take **exactly the same corrective actions** with an officer who committed the same scope of misconduct.

Unfortunately, Mr. Ursini never looked at this ultimate question, instead choosing the ignore the forest and instead focus on a few outlying trees. The Guide outlines four factors to evaluate when attempting to establish causation:

1. Reason stated by RMO for taking, withholding, or threatening the PA.
2. Timing between the protected communication(s) and personnel action(s).
3. Motive on the part of the RMO(s) to reprise.
4. Disparate treatment of Complainant as compared to other similarly situated individuals who did not make PCs.

As discussed in a later section, Mr. Ursini improperly abused the Article 31(b) rights of LtCol Nesbitt and refused to accept written answers to questions from any of my clients, thus intentionally refusing to collect all of the necessary information relevant to the first factor. He further refused to coordinate with military defense counsel for a review of the investigation's evidence in order to assist my clients in preparing their statements. In fact, the involved military defense counsel have uniformly maintained that Mr. Ursini's conduct was among the most unprofessional and incompetent among any IG investigator they had previously encountered.

The difficulty that my clients faced was the fact that LT Shaw had a demonstrated track record of weaponizing the IG complaint process to wrongfully attack senior officers and attempt to immunize himself from responsibility. While we disagree with Mr. Ursini's unsupported conclusion that my clients had motive to reprise, even he acknowledged that "motive to reprise may have been lessened or overridden by his safety concerns." It is exactly these safety concerns, which Mr. Ursini has otherwise tried to minimize, that render any legitimate attempt to prove causation fruitless.

4

It is impossible to make any analysis of whether the treatment of LT Shaw was disparate "as compared to other similarly situated individuals" because the depth of LT Shaw's conduct here is completely unprecedented. Nobody has ever heard of an unqualified IUT spending hundreds of hours to create an entirely parallel curriculum, actively undermining the qualified instructors, and secretly teaching students to disregard approved techniques in favor of unapproved and potentially deadly techniques. While other instructors may have deviated from standardized procedures, none approached even a fraction of the sheer magnitude of LT Shaw's behavior.

The only disparity between my clients' treatment of LT Shaw and what personnel actions they would have taken, absent the protected communications, is the additional caution and care that they took. My clients faced an untenable leadership dilemma of how to deal with an unmitigated safety risk being created by a junior officer with a history of filing numerous IG complaints. While whistleblowers must be protected, this protection does not mean they have a free pass to violate orders and procedures and to engage in behavior that creates risks of substantial injury, death, and millions of dollars of equipment damage. Faced with this dilemma and the near certainty of yet another IG complaint[4], coupled with the claim that they were targeting LT Shaw in retaliation, VFA-106 leadership did what we want our leaders to do – they consulted with their superiors and their SJAs and asked leadership to temporarily remove LT Shaw from VFA-106 to protect his whistleblower status. They even asked for an outside entity to conduct the investigation. Both requests were denied by my clients' superiors. In fact, VFA-106 leadership followed the guidance that Congress set forth in subparagraph (b)(2)(C) to 10 USC § 1034:

> Nothing in this paragraph shall be construed to limit the ability of a commander to consult with a superior in the chain of command, an inspector general, or a judge advocate general on the disposition of a complaint against a member of the armed forces for an allegation of collateral misconduct or for a matter unrelated to a protected communication. Such consultation shall provide an affirmative defense against an allegation that a member requested, directed, initiated, or conducted a retaliatory investigation under this section.

Mr. Ursini made a wrongful determination in this matter and my clients are being wrongfully punished for following the advice of multiple SJAs, and the provisions of 18 USCS § 1034(b)(2)(C).

**Mr. Ursini Abused Article 31(b) to Prevent LtCol Nesbitt from Explaining his Actions, Refused to Take Statements from LtCol Nesbitt, CDR Weyenberg, or CDR Roberts, Materially Misrepresented these Exchanges in his Report and Improperly Relied on the Invocation of the Right to Counsel as Evidence of Guilt.**

Mr. Ursini exhibited reckless disregard for the Article 31(b) rights of the subjects/suspects of his investigation in a manner designed to deprive the suspects their right to counsel and, in LtCol

---

[4] Upon being assigned the investigation, CNAL SJA explicitly told CDR Roberts that he should expect an IG complaint on the backside. Unbeknownst to CNAL SJA and CDR Roberts at the time was that LT Shaw had already filed the retaliation IG complaint four days earlier. Thus, CDR Roberts began his investigation while already under investigation himself.

Nesbitt's case, the opportunity to explain his actions completely by manipulating his status as a "subject" or a "suspect."

When Mr. Ursini first notified LtCol Nesbitt that he was to be interviewed, he refused LtCol Nesbitt's requests to have counsel present, claiming that he was a "subject," not a suspect, and therefore had no right to counsel. Then, when the interview commenced, LtCol Nesbitt demanded to understand his rights prior to answering questions. Mr. Ursini then read LtCol Nesbitt his Article 31(b) rights, in effect, communicating that he had become a suspect not a subject by virtue of his desire to understand his rights. LtCol Nesbitt invoked his right to counsel, terminating the interview, while affirmatively stating that for "any additional interviews, I would desire to have an attorney present."

After the aborted interview, LtCol Nesbitt contacted a Navy Judge Advocate at NAS Oceana and Maj Contreras, a Judge Advocate and defense attorney in Quantico. While not detailed to represent LtCol Nesbitt, Maj Contreras was assigned to assist him. Maj Contreras contacted first the cognizant Staff Judge Advocate and then Mr. Ursini, in order to receive unredacted copies of the final investigation. Mr. Ursini refused to engage in any meaningful communications with Maj Contreras and made clear his contempt for the involvement of an attorney. Maj Contreras was rightly concerned about Mr. Ursini's demonstrated cavalier attitude about the proper conduct of an interview and therefore requested that Mr. Ursini provide his questions in writing, and that LtCol Nesbitt be permitted to submit written answers to any questions that Mr. Ursini provided. There was significant concern that Mr. Ursini was not conducting an impartial investigation and LtCol Nesbitt wanted to ensure that none of his answers could be misconstrued or misrepresented.

CDR Weyenberg, on the advice of separate counsel, made the same offer to Mr. Ursini, which was documented in the transcript of his aborted interview "for the record, CDR Weyenberg, at the request of his counsel, has requested. that we send written questions to him and he will provide written responses." Mr. Ursini also refused this request, while similarly displaying the same overtly hostile attitude towards the attorneys and contempt for the fact that CDR Weyenberg had exercised his right to counsel.

Mr. Ursini's treatment of CDR Roberts was far more insidious, as he interviewed him for over two hours about a wide variety of topics including his knowledge of LT Shaw's protected communications, his biases against LT Shaw, the scope of his investigation, certain investigative steps taken and his ultimate findings. As it became clear that CDR Roberts' answers did not establish any bias, retaliation, or misconduct by anyone involved (aside from LT Shaw), Mr. Ursini decided to advise CDR Roberts of his 31(b) rights, effectively terminating the interview. Under UCMJ Article 31, these rights should have been read at the beginning of the interview, not after two hours of questioning. Ordinarily, such a violation of CDR Roberts' rights would invalidate and suppress any inculpatory statements made, but Mr. Ursini turned this principle on its head. As there were no inculpatory statements to suppress, Mr. Ursini instead chose not to include any of the exculpatory statements made or explanations given, which would conflict with his pre-determined conclusions. Later, through counsel, CDR Roberts also offered to answer further questions in writing.

Mr. Ursini refused all of these requests, in effect manipulating the investigation to ensure that CDR Weyenberg and LtCol Nesbitt would be prevented from providing information to refute LT Shaw's false claims and that CDR Roberts' explanations could be disregarded entirely. Still, LtCol Nesbitt provided his counseling notes and information to counter LT Shaw's fabrications. Incredibly, the report fails to mention any of this and, instead, makes several entirely misleading assertions, such as "LtCol Nesbitt invoked his right to remain silent and did not provide testimony or a statement on this topic." A more accurate annotation would have been that "LtCol Nesbitt invoked his right to counsel, upon being read his Article 31(b) rights and the investigator refused to either interview him in the presence of counsel or accept written answers to questions." Similar passages appear in the report misrepresenting the communications with CDR Weyenberg and CDR Roberts.

Not only did Mr. Ursini misrepresent my clients' invocations, he also repeatedly used that invocation as evidence of guilt:

1. "As LtCol Nesbill invoked his right to remain silent and did not provide any substantive testimony or statement in this matter, we found the Complainant's recollection of the May 7, 2018 conversation to be credible." p. 42.
2. "Absent any testimony from LtCol Nesbitt and based on the wording of the statement, we determined that LtCol Nesbitt's statement to the Complainant constituted an implied threat of disciplinary or corrective action." p. 42.
3. "We were unable to analyze CDR Roberts' conduct of the CDI for disparate treatment, as CDR Roberts invoked his .right to remain silent when questioned about his conduct as the CDI IO…no evidence was provided to support that similar actions were taken against persons who were not whistleblowers, and who were otherwise similarly situated. As such, we determined, by a preponderance of the evidence, that CDR Roberts violated 10 U.S.C. 1034 by conducting a retaliatory investigation for the primary purpose of punishing, harassing, or ostracizing a member of the Armed Forces for making protected communications." p. 59.
4. "Based on a preponderance of the evidence, CDR Weyenberg issued the Complainant an unfavorable FITREP for the period from February J through June 25, 20 18, in reprisal for his protected communications. CDR Weyenberg invoked his right to remain silent, and did not provide a statement detailing the reason he issued the Complainant an unfavorable FITREP." p. 63.

Ultimately, Mr. Ursini's conclusions were fatally infected by his reckless treatment of my clients' Article 31(b) rights, his material misrepresentations of their invocations of those rights, his refusal to accept written answers to any of his questions, and his unconstitutional use of their rights invocations against them as evidence of guilt. As I have difficulty imagining that the training that your office provides to investigators is so lacking that they do not understand these basic constitutional principles, it is far more likely that Mr. Ursini's misconduct here was willful and intentional.

**Mr. Ursini Failed to Properly Evaluate the Credibility and Motives of the Complainant**

In a case where witnesses provide opposing stories, it is vital to evaluate the credibility of the witnesses. Additionally, a professional investigator must always evaluate the credibility and motivations of the complainant when determining whether they are making a valid complaint. Mr. Ursini made no such effort here, adopting the false narrative of LT Shaw without question or any effort to test his credibility or motives to lie.

Mr. Ursini claims to have interviewed a total of 25 witnesses[5] yet fails to properly address what these witnesses told him about LT Shaw's performance and interactions with the rest of the squadron. Had Mr. Ursini asked, the rest of the squadron would not have been shy about providing their observations. Indeed, after the submission of his report led to the firing of LtCol Nesbitt, a Command Safety Assessment was conducted, with all of the instructor staff providing feedback, much of which would have been helpful, had Mr. Ursini been looking for the truth.[6]

It is undisputed that LT Shaw failed to qualify in any instructor module during his entire tour with VFA-106, despite being onboard for over 2.5 years, while the average is 6-months, with many instructors getting qualified within 3 months. LT Shaw's lack of any qualifications (and lack of any complaint that he was improperly prevented from getting qualified) should have been important to Mr. Ursini for a number of reasons, not the least of which being that it is a legitimate, non-retaliatory reason for him to receive unfavorable FITREPs.

Despite his utter lack of qualifications, he chose to illegally and surreptitiously instruct students on unapproved and dangerous procedures. He prepared his own unapproved syllabus that he secretly provided to students, in violation of orders. In particular, his conscious decision to instruct students on dangerous, unapproved carrier landing techniques has potentially far-reaching and deadly consequences, requiring significant remedial action by the leadership of the squadron to ensure that he did not endanger the lives of the students or flight deck crews.

From his actions, it is clear that LT Shaw never intended to teach the Navy's methods, many of which have been written in blood. Instead, a search for LT Shaw on the internet reveals numerous efforts to shamelessly promote himself and a false image as an innovator and master instructor, while persistently publicly criticizing the time-tested methods of Naval Aviation. Consider that, soon after he began his tour at VFA-106, and without yet qualifying to instruct even a single module, he gave an interview to promote his mastery of instructing aviators:

> Lt. Steven Shaw trains naval aviators to fly the F-18, the main jet fighter of the Navy and Marine Corps, at a base in Virginia Beach, Virginia. That's his official job. But unofficially he is working to introduce the principles of deliberate practice into naval flight training, with the ultimate goal of changing the entire training culture for naval aviators.[7]

---

[5] Interestingly, although Mr. Ursini determined that CDR Roberts coerced or coached statements from multiple witnesses, he failed to interview a single one of those identified witnesses.
[6] A copy of the report of this survey is annexed hereto.
[7] https://www.peakdeliberatepractice.com/2017/11/07/an-interview-with-a-naval-f-18-fighter-pilot-and-trainer/

In this article, he unapologetically bashes the Navy's method of training pilots and touts his great achievements in training new aviators to do carrier landings using his method, rather than the approved syllabus. All the while, he is not even a qualified instructor, is ineligible to become an instructor at carrier landings[8], and is prohibited from teaching students. This article was published well before any protected communications were made or revealed to the VFA-106 leadership.

Similarly, in a military.com article where LT Shaw touts the IG complaints of racial discrimination (were later found to be unsubstantiated) that he helped two former students file, LT Shaw again unapologetically promotes himself as a master instructor and his contempt for the Navy's approved methods:

> Shaw believes that training should be less punitive, and evaluations should be less subjective. In his own instruction, he says he puts that theory into practice. He doesn't document negative aspects on grade sheets, and he works with students outside a graded environment to improve technique and performance. If a student is failing, he said, the instructor should be held accountable. "When I work with them, because their training approach and technique is more effective, they all improve at the same rate. They're all in the same window of beginners," Shaw said…Shaw said he'd do away with graded simulator events entirely, which he compared to scoring performance during practice. During sims, he said, students need to learn and familiarize themselves with systems, rather than worry about being assessed. Shaw is convinced that, given the chance, his method could save any foundering student who has made it into the training pipeline. "When they tell me that [Savage and the other pilots who spoke to Military.com] are just no good, not only is it obvious to me that they're the only minorities, they're being removed," Shaw said. "It's, 'Oh come on, I could get them better than you in under a week.'"[9]

LT Shaw's well publicized contempt for the approved methods of Naval Aviation, inflated sense of importance and skill, despite his inability to achieve the necessary instructor qualifications, would normally be the end of an aviator's career. However, to immunize himself from any consequences while continuing to fraudulently hold himself out as a master instructor, LT Shaw made use of the IG system to make protected communications and then paint himself as the victim of the squadron's leadership.

Another troubling aspect of LT Shaw's behavior is his use of the news media to make unauthorized statements, in his capacity as an "instructor," negative to the Navy and Naval Aviation. LT Shaw uses his official billet as an instructor (while failing to disclose that he is not qualified) to make these statements. In addition to the articles in which he is featured, LT Shaw also surreptitiously leaks information to the press to further his personal agenda, at the expense of

---

[8] Only qualified Landing Signals Officers are eligible to become instructors in carrier landings. LT Shaw never attended LSO School.
[9] https://www.military.com/daily-news/2018/04/04/naval-aviators-say-they-were-kicked-out-training-due-racial-bias.html

9

the Navy. For example, we have received inquiries from reporters regarding a significant amount of private information that LT Shaw has released to the media, including several surreptitiously recorded conversations with LtCol Nesbitt, as well as copies of LtCol Nesbitt's personal notes.[10]

## Conclusion

VFA-106 leadership was presented with a choice – to avoid the appearance of retaliation by allowing LT Shaw to continue his dangerous behavior, or to prioritize their responsibilities of command and address a serious safety issue, as well as an issue of good order and discipline by a member of their command. They chose, after consulting with the SJAs, to prioritize their duties to the safety of the personnel under their command and the crews onboard the carriers. Punishing them for that choice sets a dangerous precedent.

Much has been made in this report about an email allegedly describing the CDI as an attempt to "kamikaze" LT Shaw. Despite efforts by Mr. Ursini to mischaracterize this statement and misuse Article 31(b) to prevent CDR Roberts from explaining, it is clear that the intent behind it was to describe his acknowledgment that any effort to investigate LT Shaw's misconduct was likely a suicide mission because a retaliatory IG complaint would undoubtedly be filed, regardless of its meritless nature. In fact, LT Shaw filed the complaint alleging retaliation before CDR Roberts had even been assigned as the investigating officer.

Protecting whistleblowers is important. However, Mr. Ursini improperly prioritized this protection over his duties to conduct fair, impartial, and ethical investigations by deliberately ignoring significant facts and refusing to accept important information from witnesses. His report noticeably does not find any fault with the results of the CDI, which found significant misconduct by LT Shaw. Rather, Mr. Ursini only claims that VFA-106's leadership appears to have been motivated to commence this investigation out of reprisal. This logical *non sequitur* appears to reinforce the notion that Mr. Ursini believes that LT Shaw should have been immunized from any consequences of his dangerous conduct because of his status. This is a very dangerous precedent to set and runs counter to the law.

Respectfully submitted,

Timothy C. Parlatore, Esq.

---

[10] It is unknown how LT Shaw came to possess a copy of LtCol Nesbitt's notebook in the first place. It appears that he either unlawfully searched LtCol Nesbitt's office to make copies for himself or received copies from Mr. Ursini. Either possibility is a very serious and deeply concerning issue.